1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4              Plaintiff               )
                                        )
5         -VS-                         )  Criminal No. 15-10224-PBS
                                        )  Pages 1 - 59
6    JERRI MARTINEZ-TEJEDA,             )
                                        )
7              Defendant               )

8                            **SENTENCING**

9

10        BEFORE THE HONORABLE PATTI B. SARIS
          UNITED STATES CHIEF DISTRICT JUDGE
11

12

     A P P E A R A N C E S:
13

          THOMAS E. KANWIT, ESQ., Assistant United States Attorney,
14   Office of the United States Attorney, 1 Courthouse Way,
     Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.
15

          NEIL S. TASSEL, ESQ., Denner Pellegrino, LLP,
16   Four Longfellow Place, Suite 3501, 35th Floor, Boston,
     Massachusetts, 02114, for the Defendant.
17

     ALSO PRESENT:  Deborah Huacuga, Spanish Interpreter.
18                  Jennifer Broquist, U.S. Probation Officer.

19

                              United States District Court
20                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
21                            October 24, 2016, 10:15 a.m.

22

23              LEE A. MARZILLI
              OFFICIAL COURT REPORTER
24         United States District Court
           1 Courthouse Way, Room 7200
25              Boston, MA  02210
                 (617)345-6787

<u>P R O C E E D I N G S</u>

1    THE CLERK:  Court calls Criminal Action 15-10224,

2    United States Martinez-Tejeda.  Could counsel please identify

3    themselves.

4    MR. KANWIT:  Good morning, your Honor.  Thomas Kanwit

5    on behalf of the United States.

6    MR. TASSEL:  And good morning, your Honor.  Neil

7    Tassel on behalf of Mr. Jerri Martinez-Tejeda to my left with

8    the aid of the Interpreter.

9    MS. BROQUIST:  Good morning, your Honor.  Jennifer

10   Broquist from Probation.

11   (Interpreter Deborah Huacuga duly sworn.)

12   THE COURT:  Let me start off by asking Mr. Tassel,

13   have you seen the plea colloquy, the transcript?

14   MR. TASSEL:  I received it over the weekend.

15   THE COURT:  Does that change your legal position at

16   all?  Or factual, I should probably actually say factual

17   position?

18   MR. TASSEL:  No.  I mean, it doesn't in the sense that

19   I maintain, as I've always maintained, not that who he is or

20   who he not is or what he has done or what he hasn't done, I

21   took the position and I'm maintaining it, respectfully, he

22   admitted to the face of the indictments as fully charged by the

23   government without any hesitation, but the enhancements he has

24   asked the government to prove.  And in every pleading that I've

1                    <u>P R O C E E D I N G S</u>

2         THE CLERK:  Court calls Criminal Action 15-10224,

3    United States Martinez-Tejeda.  Could counsel please identify

4    themselves.

5         MR. KANWIT:  Good morning, your Honor.  Thomas Kanwit

6    on behalf of the United States.

7         MR. TASSEL:  And good morning, your Honor.  Neil

8    Tassel on behalf of Mr. Jerri Martinez-Tejeda to my left with

9    the aid of the Interpreter.

10        MS. BROQUIST:  Good morning, your Honor.  Jennifer

11   Broquist from Probation.

12        (Interpreter Deborah Huacuga duly sworn.)

13        THE COURT:  Let me start off by asking Mr. Tassel,

14   have you seen the plea colloquy, the transcript?

15        MR. TASSEL:  I received it over the weekend.

16        THE COURT:  Does that change your legal position at

17   all?  Or factual, I should probably actually say factual

18   position?

19        MR. TASSEL:  No.  I mean, it doesn't in the sense that

20   I maintain, as I've always maintained, not that who he is or

21   who he not is or what he has done or what he hasn't done, I

22   took the position and I'm maintaining it, respectfully, he

23   admitted to the face of the indictments as fully charged by the

24   government without any hesitation, but the enhancements he has

25   asked the government to prove.  And in every pleading that I've

1   made I've tried to remain consistent with that, that, in my

2   view, the government is obligated to either prove these

3   enhancements for your Honor to decide them or not.  I don't

4   take the position who he is or who he is not or what alias he

5   may have used or what he hasn't used.

6           THE COURT:  Well, no, let me be very clear here.  It

7   is my practice to always ask whether or not the defendant has

8   certain aliases listed in the indictment.  I always ask it.

9   And in particular here, I asked the defendant in the plea

10  colloquy if he was Ricky, and he said "yes," all right?  Now,

11  in case that was just he was nervous, I kept reading, and he

12  admitted various other things.  There were certain reserved

13  issues, like the amount of the drugs, or the amount of the

14  money, or whether he knew about Oklahoma.  I can't remember,

15  there were certain -- and you specified them.  It was you.

16          MR. TASSEL:  I understand.

17          THE COURT:  And it was never the identity as Ricky

18  or -- well, that's primarily it.  There are other things that

19  weren't contested as well.  You specified the four things.

20          Then if you get into the fact, "Were you dating Yoelly

21  Carmenatty?" those pieces of the PSR weren't even objected to.

22          MR. TASSEL:  No, and, again, I understand --

23          THE COURT:  And he was the father of her child.

24          MR. TASSEL:  I'm not disputing that and he's not

25  disputing that.  I'm only taking the position -- and I

1    understand it's a fine line, your Honor, about the burden of

2    proof as to the enhancements.  Whether he admitted or not that

3    he is referred to -- frankly, it's --

4         THE COURT:  Well, I don't want to be stuck with a 2255

5    going down the line here, so I want to make sure.  Have you

6    shared with him the plea colloquy?

7         MR. TASSEL:  I got it too late to share it with him

8    with the aid of the Interpreter, unfortunately.

9         THE COURT:  Well, this is what I want to do:  I've got

10   time this morning.  I want you to go back there and talk to him

11   because your sentencing memo, and indeed the tail end of the

12   last-time sentencing, took me by surprise.  I understood you

13   were challenging the amount of money.  I actually agreed with

14   you on some of it.  I understood you were challenging role in

15   the offense, and there may have been another enhancement in

16   there, you know, we could talk about today -- for example,

17   whether he directed violence -- but never did I anticipate that

18   he was challenging that he was the Ricky on the phone.

19        MR. TASSEL:  And, again, because on the record I want

20   to be clear, he's challenging whether or not the government

21   proved sufficiently at the hearing to allow your Honor to find

22   that he was Ricky.  That's all I'm saying.  Whether or not he

23   has agreed or didn't agree to --

24        THE COURT:  If he admitted it, it's over.  As far as

25   I'm concerned, the issue is over.  I'm reading your memo:  "The

thrust of the Presentence Investigation Report is that the
defendant is in fact the target of the investigation and the
individual recorded on TT-3 and TT-4 known as Ricky.  However,
the government has failed to prove this point, and indeed the
evidence adduced points in many ways to an alternate conclusion."

MR. TASSEL:  Precisely, and I understand --

THE COURT:  That's just wrong based on his admission,
unless there's something that I'm not getting here.

MR. TASSEL:  I will say that I didn't have the benefit
of the plea colloquy completely.

THE COURT:  Well, it makes a big difference to me as
to how to go forward with this.  And so I don't know if this
was your not remembering that he admitted it and thought that
this was a good legal point or him, but it matters.  So I want
you to take the plea colloquy back with you and the
Interpreter, and I don't want to be back here in two years on
ineffective assistance of counsel because you took a position
that was so plainly contradicted by the record.

MR. TASSEL:  I have to say, not having had the benefit
of the Rule 11 transcript at the time that I filed my
post-hearing memorandum, I appreciate the time to address this
with him with the help of the Interpreter, and I'll relay back
to the Court --

THE COURT:  I didn't understand this was your position
till literally the tail end of the last proceeding, and I was

1  thinking, "All right, you're leading up to this?"  And then we

2  looked at the plea colloquy, so --

3       MR. TASSEL:  And, again, I took the position that I

4  did because I felt that I didn't want to steer the government

5  in any direction about how they proceeded in the sentencing

6  hearing, and at the conclusion of the hearing, I made the

7  arguments that I did in my post-hearing memorandum based on my

8  I think good-faith understanding of the evidence at the

9  hearing.  If he admitted to anything beyond that in the

10  Rule 11, I'll have the opportunity to review it with him and --

11       THE COURT:  Right now you're going to because, as I

12  understand it, regardless of what I do in the other

13  enhancements, the government, if you press this point, as I

14  understand it, is seeking to withdraw the third point for

15  acceptance; and at the high end of this grid, that makes a lot

16  of difference.

17       MR. TASSEL:  I understand that.

18       THE COURT:  I'm not sure they even legally can -- let

19  me just say that -- but certainly I think it would help the

20  government's understanding of its position depending on what

21  position --

22       Are you still pressing that, Mr. Kanwit?

23       MR. KANWIT:  Yes, we are, and absolutely we have the

24  legal authority to do that.

25       THE COURT:  I'm not sure you do because I kept

1  rereading and reading again.  Certainly you don't with respect

2  to his challenge to any of the other enhancements.  You just

3  don't.  A defendant has the right to challenge the enhancements

4  without losing that third point, but at some level, if you're

5  challenging the basic, I don't know, I mean, that you're the

6  defendant or the person who you said you were, I don't know how

7  far that goes.

8          And I'm ready to do this sentencing.  This has gone on

9  too long and getting more complicated, not less complicated,

10  okay?  And you might want to read the -- the primary goal

11  behind this is to save the court resources in doing a trial,

12  and I believe he did plead early on.  There are certain

13  exceptions to this rule, but it is not the fact that he

14  challenged the enhancements.  And indeed it didn't come in,

15  your position, till after the challenge to the identity.  Is

16  that right?

17          MR. KANWIT:  No.  We suggested that he was putting the

18  third point in jeopardy directly to Mr. Tassel early on.  When

19  we got the objections to the PSR that were essentially blanket

20  objections, I told Mr. Tassel that I thought he was putting the

21  third point --

22          THE COURT:  I think that is a legally untenable

23  position just because you challenge the enhancements.  Now,

24  does it get to a point where it's just so off-base?  I don't

25  know, and we'd probably have to do some research on it.

1          MR. KANWIT:  Well, I think there's a difference, your

2     Honor, if I might, between the government moving for the third

3     point and the Court awarding the third point.  We're not

4     obligated to move for the third point under these circumstances.

5          THE COURT:  But you're not permitted to withdraw it

6     simply because he's challenging the enhancements, and that is

7     the position I'm taking.

8          MR. KANWIT:  Well, we haven't moved for the third

9     point, so we're not withdrawing anything.

10          THE COURT:  All right, that's fair enough, but, in any

11     event, I'm not sure legally you can, but there are -- I don't

12     know what I'm going to do, let's put it that way, I don't know

13     what I'm going to do because until this most recent filing in

14     the tail end of the last hearing, I believed the challenges

15     were to the amount of the drugs.  Fair enough, I went with you

16     partially, you know, but not that he's Ricky.

17          MR. TASSEL:  And again --

18          THE COURT:  So go back there and talk to him.

19          MR. TASSEL:  Will do.

20          THE CLERK:  All rise.

21          THE COURT:  Five minutes.

22          (A recess was taken, 10:25 a.m.)

23          (Resumed, 10:37 a.m.)

24          THE COURT:  Mr. Tassel.

25          MR. TASSEL:  Well, I did use those five minutes as

1  efficiently as I could, and Mr. --

2          THE COURT:  Actually, it turned into more than five,

3  maybe fifteen, but --

4          MR. TASSEL:  Oh, it felt like five.

5          THE COURT:  I'm sure it did.

6          MR. TASSEL:  The fact is that he has reviewed his

7  Rule 11.  He acknowledges at the Rule 11 that he admitted to

8  your Honor that he had gone by the name of Ricky.  And although

9  that had not previously been an exhibit in the sentencing

10  hearing, obviously it's before your Honor now, and he admits

11  that he has used that name Ricky, at least in the Rule 11

12  hearing, if not in other instances relevant to the discussion

13  we're having.

14          THE COURT:  All right, so now the record has been

15  closed.  Mr. Kanwit, let's hear argument.

16          MR. KANWIT:  Thank you, your Honor.  Your Honor, one

17  of the frustrations anytime the government comes before the

18  Court, or a jury for that matter, in a case that has a long

19  investigative history such as this one is that we have to make

20  decisions about what we present to the finder of fact, and

21  there's a winnowing process, and there's a recognition that the

22  Court or the jury's time is valuable, so we can't take

23  everything we know and give it to the finder of fact.  We have

24  to make choices.

25          What is absolutely apparent to everybody who was

involved in the investigation of this case, and I hope I've made the right choices in what we've presented to the Court, is that this defendant, Mr. Martinez-Tejeda, is a career drug trafficker.  He is the head of his organization based in Lawrence, Massachusetts.  He has been involved in multiple-kilogram deals.  A small deal for Mr. Martinez-Tejeda would be the 3 kilograms of heroin, for example, in Woburn that he's basically doing as a favor to his source of supply in Mexico.

We've presented evidence through Special Agent Hamelin's testimony that Mr. Martinez-Tejeda was intercepted discussing dozens of drug deals.  We chose to present to Probation and to the Court evidence on four specific ones.  I have come back to the Court suggesting that by a preponderance we've proven all four.  I recognize that the Court has expressed its reluctance about two of those deals, so I'm going to push primarily on another tact regarding the scope of the specific drug deals or the scope of his operations.

First, you have the general testimony about the intercepts.  Second, and perhaps most importantly, you have the amount of money that we know was laundered by Mr. Martinez-Tejeda, over $632,000 in a very short time span.  I think it was about five and a half months that the financial analyst, Lori Moccaldi, testified to.  That was just a snapshot, she said.  She had additional bank records.  There was an

1   additional time period that we could have looked at, but in

2   that time period, well over half a million dollars went through

3   bank accounts that she could link to this organization through

4   text messages and photographs of deposit tickets, customer

5   receipts, on the telephones of Carmenatty and this defendant,

6   and, in addition, through photographs of people making the

7   deposits.  I don't think there's any doubt that those deposits

8   relate to this drug-trafficking organization.

9        In addition, as the Court is well aware, over $511,000

10  in cash was found at the time of the takedown.  In fact, the

11  takedown was done when it was done because the agents knew that

12  Mr. Martinez-Tejeda was going to give that money to the

13  Englishman for transport, and they --

14       THE COURT:  Excuse me.  So this sort of goes to the

15  forfeiture issue as well.  So $511,000 was seized, and another

16  $632,000 essentially you have bank records to support?

17       MR. KANWIT:  Yes, your Honor.

18       THE COURT:  And what are you asking in the forfeiture?

19       MR. KANWIT:  $1 million.

20       THE COURT:  In forfeiture?

21       MR. KANWIT:  Yes.  No, that's a fine.  We're asking

22  for a fine.

23       THE COURT:  I thought we were doing forfeiture too.

24       MR. KANWIT:  There is forfeiture.  I don't know the

25  defendant has contested the $500,000 but --

1          THE COURT:  Is that what the forfeiture is, for the

2    $500,000?  We've already got that?

3          MR. KANWIT:  I would have to look at the indictment

4    again.  I think we've already got the $500,000, and I don't

5    think he's contested that.  But what I've argued in my

6    supplemental memo, and I'm arguing to you today, is that

7    although the government would disagree that we haven't proven

8    two of the drug deals by a preponderance, the Court can look at

9    the amount of money that was flowing through this organization.

10   We cited case law in our brief that says that can be viewed as

11   a sign or as a substitute, as a marker for the amount of drugs

12   that the organization was processing.  And I gave a couple of

13   equivalencies.  I think it was -- if you just take the money

14   and convert it to kilos of cocaine, it's 35 kilos of cocaine.

15   If you convert it to fentanyl, it's approximately 19 kilos of

16   fentanyl.

17         THE COURT:  Based on what, though?  I couldn't --

18         MR. KANWIT:  Based on, the defendant himself said that

19   if he lost those 9 kilos of fentanyl in Oklahoma, he would be

20   out $500,000 or $600,000, so that's one measure of the value.

21   Then we have presented evidence that his supplier said, "What

22   do you want to pay for the cocaine?  I could do it at 30 or

23   31," and Special Agent Hamelin testified that's $30,000 or

24   $31,000.  Those are just approximations.  This is not where we

25   have to get within $100 or even $1,000 per kilo because if the

1   Court finds any additional drug weight essentially, he's maxed

2   out; and we believe that given the scope of his operation,

3   that's absolutely the appropriate finding based on a

4   preponderance of the evidence.  We have Special Agent Hamelin

5   testifying that he talked about many, many deals.  We have

6   evidence that he was negotiating four deals, two of which the

7   Court has indicated it accepts were consummated, two of which

8   we argue were likely consummated; but even if you don't find

9   they were consummated, the money flowing through is evidence of

10   consummation of those or other deals.  You don't have that kind

11   of money flowing through unless you are buying drugs and

12   selling drugs.  There's no evidence of any legitimate source of

13   that kind of money, and I think it would be preposterous to

14   suggest that there is.

15        In addition, the defendant talked about getting ten

16   push-to-talk phones because he had a big organization.  He

17   talked about being a member of the 500-kilo club or wanting to

18   get into it and already being a member of the 100-kilo club.

19   This is not somebody who was dealing 20, 30, even 100 grams at

20   a time.  This is somebody who was buying multiple kilos

21   multiple times.  There may have been a few periods when his

22   source of supply were short, he couldn't get something, but

23   basically he was dealing tens, if not hundreds of kilos every

24   year.  We believe that he's probably dealing 50 to 60 kilos a

25   month, you know, with some fluctuation.

1    So that's why we think the Court has ample evidence to

2 find that he was responsible for not only the 9 kilos of

3 fentanyl, the 3 kilos of heroin that we've called the "Woburn

4 deal," but also at least 10 to 20 additional kilos at a very,

5 very, very conservative estimate.  I think it's more likely

6 over 100 additional kilos just based on the money alone.  So

7 that's where the government is on the weight.

8    The Court expressed some initial thinking on the

9 leadership enhancement.  I've taken pains to point out in my

10 supplemental memo, to make sure we're on same page, that this

11 defendant doesn't need to supervise --

12    THE COURT:  Yes, I know that.  That's true of either

13 the plus 3 or the plus 4.

14    MR. KANWIT:  Right.  So then it becomes a question of,

15 was he an organizer or a leader of anybody?  And we think we've

16 established that by a preponderance.  And then the subsequent

17 question, how many people?  Well, he admitted in the Rule 11

18 that he was in a conspiracy with five other defendants.  That

19 alone ought to be enough, given the evidence we've introduced,

20 that he was the head of this drug-trafficking organization.  So

21 I think we've established the plus 4 for role by more than a

22 preponderance but certainly by a preponderance.

23    In addition to his co-defendants, we have the other

24 people who laundered money and other people he worked with to

25 organize these drug deals, like Rigo out in California and

German.  So all they have to do is be involved in the
organization, and all he has to do is be a leader of the
organization of somebody.  So we think that's the plus 4.

On the violence, I think the Court is well aware and I
think the Court has indicated as a preliminary matter, it's
likely to go the government's way.  There's no doubt that it
was this defendant on the phones talking about torturing Solis
and Rougeau and talking about putting a gun to Rougeau's head
if he doesn't talk, and, in somewhat of a mixed metaphor,
ripping his head off if he doesn't tell the truth.

It doesn't matter if he wasn't able to get somebody
there in time.  The government's evidence, according to Special
Agent Hamelin and the intercepts we put in is, he was
desperately trying to get somebody there to grab Solis, maybe
get Rougeau if Rougeau wasn't gone, and try to save his deal.
We put an intercept into evidence in which he says, "This is my
life.  If I lose this, I'm out $500,000, $600,000.  This is my
life we're talking about here."  And he was absolutely trying
to do everything he could to exact the truth from the two
couriers that he thought had ripped him off and showed no
hesitation about doing so.  It's not like he got cold feet and
tried to pull them back.  The only reason Solis wasn't
captured, kidnapped, and tortured is because we had her
effectively arrested for her own protection.  So that's the use
of violence.

1          Then on the gun enhancement, I think the Court again
2     was inclined our way.  We've argued in our supplemental filing,
3     as the Court is aware, the standard is not exclusive
4     possession.  It's not constructive possession.  It only has to
5     be available for use in connection with the crime.  Many courts
6     have found that if you keep guns in your home and you're a drug
7     dealer, that's in furtherance of the crime because guns are
8     used to protect drug dealers themselves, protect their money,
9     protect their drugs.  And for the reasons behind the
10    enhancement, which are to try to discourage violent crime, the
11    Sentencing Commission has said in the application notes that
12    this is exactly the situation, drug dealers having guns, which
13    is likely to increase the use of violence.  So --
14         THE COURT:  Were both found in the bed stand next to
15    Yoelly Carmenatty's and his -- or one was found there?
16         MR. KANWIT:  One was found -- the larger gun was found
17    in that bed stand.  The other gun was found in a dresser.
18         THE COURT:  In the bedroom?
19         MR. KANWIT:  In the bedroom.  And he admitted during
20    the Rule 11 that both guns were found in his bedroom.  This was
21    not a house that he originally rented with Yoelly Carmenatty,
22    although, frankly, there is no evidence about that before the
23    Court.  We didn't go there.  That's just me arguing.  It was
24    his place initially.  She came into the relationship later.
25    But what's before the Court on the barebones facts are that two

guns were in the bedroom he shared with Yoelly Carmenatty, and my understanding is, that is sufficient for the Court to find that the gun enhancement is applicable.

If I may now, I'd like to pivot to the government's recommendation. In 25 years as a federal prosecutor, not all of which was spent doing criminal cases, but in the time I've been a criminal prosecutor, I have never recommended a sentence of 30 years. I did so with some hesitation and after consultation with others in my office. I have no doubt that Mr. Martinez-Tejeda has good points about him. I'm sure he's not all bad. None of us are all one thing or another. But in this case, I had to look at it in comparison to other drug cases I've had, and here is why Mr. Martinez has earned a 30-year sentence:

First of all, the volume of drugs that he dealt was large. Second of all, the type of drugs he was dealing has led unequivocally to deaths of people in Massachusetts at an alarming rate. The Court is well aware, although we also put this in our prior sentencing memo --

THE COURT: Have you tracked any of these drugs to a death, or are you talking in general about the --

MR. KANWIT: I'm talking in general, talking in general. I can tell you, although it's argument, I can tell you that given the amount of fentanyl he had, the 9 kilos of fentanyl, which would have been diluted by a factor of at least

1  10 or 20, the likelihood of an overdose coming out of that
2  amount of fentanyl is very, very high because fentanyl is 50 to
3  60 times more powerful than heroin by weight, and neither this
4  defendant nor any other dealer of which I'm aware uses a
5  scientific method for diluting their product.  They will have a
6  user test the stuff and say, yeah, you can step on this three
7  or four times, or whatever.  It's not a very reliable method,
8  and that's why overdoses are spiking.
9        In particular with fentanyl, I can tell you, it's
10  anecdotal, but in the spirit of my argument, the DEA lab
11  refused to take the packaging material for the fentanyl out and
12  test it for fingerprints at my request because they said,
13  "We're not going to handle this again.  It's too dangerous.
14  We've never seen 9 kilos of fentanyl."
15        Now, unfortunately, that was a year and five months
16  ago.  The same cannot be said at this point.  They've seen
17  other large volumes of fentanyl.  But it's very, very dangerous
18  stuff, and people don't know what they're getting.  They don't
19  know if they're getting heroin, which is, you know, strong,
20  weak, medium.  They don't know if they're getting heroin mixed
21  with fentanyl.  They don't know what they're getting.  And the
22  number of overdoses has risen -- I think we cited the
23  statistics in Lawrence -- more than two- or three-fold in the
24  last two years.  That is a horrifying statistic.  And this
25  defendant was in business selling heroin and fentanyl and

cocaine for money, purely for money, and he didn't care what
happened to people who used his drugs, did not care. And not
only was he, you could say, passive about the impact of his
drug trafficking on ultimate users, he was actively violent
when it came to people he thought had ripped him off.

So that leads me to my recommendation because Jerri
Martinez-Tejeda has caused a lot of harm, and the likelihood of
very serious harm flowing from what he's done is very high, and
I think the public needs to be protected from that, and that's
why I've recommended a 30-year sentence.

THE COURT: Thank you. Mr. Tassel.

MR. TASSEL: Your Honor, whether now is the
appropriate time or after I'm done, I know Mr. Tejeda wants to
address the Court.

THE COURT: Of course.

MR. TASSEL: Would you have him do it now or after I
speak?

THE COURT: Afterwards, I think.

MR. TASSEL: Okay.

THE COURT: But let me also say, I didn't see why you
sealed your sentencing memo, and I'm going to unseal it.

MR. TASSEL: And that's fine, your Honor. Frankly, I
rather followed the suit of the government with respect to how
the memos were being filed.

THE COURT: I don't think yours was filed under seal,

1    was it?

2         MR. KANWIT:  It was, your Honor.  Actually, this might

3    be the appropriate time --

4         THE COURT:  I'm unsealing all of them.  I'm sorry,

5    you're right, it should be --

6         MR. KANWIT:  Your Honor, this would be, I think -- and

7    I beg your indulgence -- I don't ask this lightly -- but if we

8    could have a three- or four-minute sidebar, it's important.  I

9    wouldn't ask if --

10        THE COURT:  Well, not right now.  Maybe when we're

11   done.  We're too midstream.

12        MR. TASSEL:  I have filed -- I hope your Honor at this

13   point, just to summarize, has got my original kind of

14   mid-hearing memorandum, the post-hearing memorandum, and I

15   think it was last night I forwarded to the Court five letters

16   or six letters from --

17        THE COURT:  I did see those.

18        MR. TASSEL:  I'm sorry?

19        THE COURT:  I did see those.

20        MR. TASSEL:  You did, okay.

21        THE COURT:  From family members.  Are they here?

22        MR. TASSEL:  They are.  They are.  This is this group

23   of individuals in the back row.  There are five.  His mother

24   could not make it today, although you may take note of the fact

25   that she has been at every other proceeding.  She just could

1  not physically bear to be here today under the circumstances,

2  but she has attended every other hearing.

3      THE COURT:  Could you give me the names of who's here.

4      (Pause.)

5      MR. TASSEL:  If your Honor is so inclined, I'll

6  continue --

7      THE COURT:  Yes, why don't you.  Yes, that's great.

8      MR. TASSEL:  I'm not terribly inclined to reargue what

9  I've already written.  I just want to summarize one point which

10 is not in here, is that with respect to this third point issue,

11 when Mr. Tejeda entered the plea, it was based on our

12 understanding of the evidence that the government obviously was

13 ready to present at sentencing and at trial.  As the matter

14 progressed towards sentencing, in my discussions with

15 Mr. Tejeda, I focused, perhaps unduly, on what could the

16 government actually prove to the Court for purposes of proving

17 the enhancements?  And I realized upon close review that some

18 of the evidence was qualified with respect to whether or not

19 the government really had strong evidence with respect to

20 whether or not this individual is Ricky.  He did admit to it.

21 That is legal machinations by myself.  It should not be held

22 against Mr. Tejeda in any respect.  He's always been very clear

23 with me that he wants to fully accept responsibility for his

24 actions.  And so if there's any fault in suggesting to the

25 Court that the government may not have been able to prove that

1    he is in fact Ricky, take that out on me and not my client.

2           But that being said, some of the things were rather

3    qualified, I felt, and what I learned, not from the

4    government's evidence but from other sources, that the

5    government, even at the time of the execution of the search

6    warrant at Pere Marquette, was asking people, "Which one of you

7    is Ricky?" and then forwarding a picture apparently to an

8    off-site informant that I was not previously aware of.  That

9    triggered in me a reaction by a zealous advocate to make the

10   argument that maybe they really weren't sure that he was Ricky.

11   But I pray your Honor's indulgence on that.  I'm not going to

12   argue that point any further for purposes of sentencing.

13   The --

14          THE COURT:  Did you review the sentencing memorandum?

15          MR. TASSEL:  No, because, as I may have pointed out,

16   you may not have been aware that given the timing, I was not

17   able to secure an opportunity with an informant to get back

18   there after the close of evidence to see Mr. Tejeda.  So the

19   last time I saw him was when he was in court, and although

20   there was a general idea, depending on where the evidence

21   flowed, that might be an argument that I made.  Without the

22   benefit of the Rule 11, I really was a bit hamstrung to know

23   specifically whether or not he had admitted that aspect.  And

24   also the fact remained in my mind that within this case, with

25   the indictments and the rest of the evidence, the belief that

1   he was Ricky certainly was there, and so for him to respond to
2   the Court, "Are you also known as Ricky?  Yes, I am, I'm known
3   as Ricky in this case."  But, as I say, I'm not arguing that
4   point.  I'll move on to the enhancements themselves.
5           The first issue with regard to the weight, which is
6   not an enhancement but it's a determination of the base level
7   of sentencing, there's no question based on the evidence that
8   was produced that the 9-kilogram transaction was interrupted,
9   was midstream in Oklahoma.  There was some authority presented
10  to the Court, some evidence that the 3-kilogram Woburn deal
11  occurred, but to suggest that this individual is involved in a
12  career of drug dealing is I think overbroad for a couple of
13  reasons.  This was a relatively short wiretap.  There's
14  evidence that they start looking at him I think in March of
15  2015.  They really get up and running a little later, and
16  basically it's all May and June and early July that's contained
17  in the evidence that's provided to the Court.  It's not a
18  lifetime of drug dealing.  It's not a career of drug dealing,
19  respectfully.
20          And when one tries to kind of reverse engineer the
21  money to drugs, I suggest that it does require a little bit of
22  speculation in a couple respects.  It bears some speculation
23  that all of the money that is at the house is the proceeds
24  directly of this DTO, for lack of better terms, drug dealing.
25  We know from the evidence that Michael Bate was there to

collect money. Whether the money that was being collected was solely from this DTO or whether it was commingled with another DTO, we know that this individual, Saul Torres, who's known as The Maestro, kind of appears out of the blue that day. Whether or not currency was brought with him that adds up to the total, I couldn't say and I don't think the government could say. I'm not talking about the forfeiture. The money is seized, and that aspect of it is not objected to, but when you start trying to reverse engineer amounts based on the drugs that are found in the house, I think it invites some unwarranted speculation.

The point of the firearm enhancement, I recognize, there's no disputing that two guns are found in the house. I make the point that there is -- there is a continuum in these situations of what is possession. If it's completely unknowing, if the moment before a search warrant is executed a car drives down the street and throws a gun through the window, I think everybody would probably agree that that's not properly attributable to the occupants of the home. On the other end of the continuum is, if the person is shooting back at the police, that's obviously going to be a valid possession of a firearm as part of the operation of the DTO. At some point there has to be a recognition of knowledge, I think, that's credited to the person for whom the enhancement is found. It doesn't have to be used in any way, it doesn't have to physically be possessed, but it does leave open the possibility, when I look at the

facts of this case, particularly for two reasons:  number one,
the complete chaos that was taking place in the home.  I took
some pains to raise that issue.  I don't think anybody disputes
that for about five minutes people were running rampant within
the house, discarding things, moving things around, running up
and down the stairs.  It raises the possibility that those guns
were not there prior to the execution of the search warrant
beginning.  There were a number of occupants that come to the
home in the short period of time before the execution of the
search warrant, and it raises the reasonable inference that
they could have been deposited there during this period of
pandemonium within the house.  And that point I think is also
reinforced in the evidence by the fact that in Ms. Carmenatty's
phone we see a picture of her brother holding what appears to
be the same gun, and we don't see, conversely, any evidence of
the gun physically in the possession --

          THE COURT:  Who did you say was holding one of those
guns?

          MR. TASSEL:  Ms. Carmenatty's brother.  In the
examination of Agent Hamelin, he acknowledged that in the
memory of the phone of Ms. Carmenatty, the gun is seen in the
hands of her brother.  This is the larger of the two guns, the
one that's found in her nightstand.

          THE COURT:  The other one was found on jeans?  Is that
the picture?

1    MR. TASSEL:  The smaller one in the jeans is not the

2    one that was in the possession of her brother.  The larger

3    Smith & Wesson, the .40 caliber, if you will, was the one that

4    was found --

5    THE COURT:  And the brother was not in the house?

6    MR. TASSEL:  He was not in the house.  And for those

7    reasons, I think it would be reasonable to say, at least by the

8    preponderance standard, that there isn't any direct proof that

9    he knew the guns were in the house.  If they were mixed with

10   his own possessions, I took a period of time looking at the

11   photographs --

12   THE COURT:  Weren't they guy's jeans?

13   MR. TASSEL:  It's not clear, but everything else

14   that's on that dresser, on the top, there's a lot of perfumes,

15   there's a lot of female kind of personal-care items.  In the

16   top left drawer of the same dresser, there is some feminine

17   hygiene products, and it raises the inference that the little

18   chrome-plated gun that was in the bottom drawer of that dresser

19   was not one that was his.

20   And I point out also that his identification and

21   wallet was on top of the other dresser, the one that has the

22   television on top of it, along with the kind of masculine skull

23   sculpture, and given those two facts, I make the argument that

24   it's hard to say that he --

25   THE COURT:  Do you know which exhibit number the gun

1   pictures are?

2           MR. TASSEL:  So 37 shows the Smith & Wesson pistol.

3   It's in my memo.  So you have 31 and 32 and 33 being related to

4   the smaller gun.

5           THE COURT:  So 31 is on a series of jeans.

6           MR. TASSEL:  Right.

7           THE COURT:  And I can't tell what the black thing is.

8           MR. TASSEL:  No, but what I point out is that in the

9   other pictures of 33, you see that it looks like nothing but

10  feminine kind of articles related to the top of it.  And in 38,

11  which I make the argument, and I think it's accurate, that 38

12  is the top left drawer of that same dresser.  And, as you can

13  see in the back left, there's some clearly feminine --

14          THE COURT:  I thought that was in the nightstand.  No?

15          MR. TASSEL:  No.  38 is the top left drawer of the

16  dresser, and I say that for a couple reasons, because --

17          THE COURT:  Were they were both found in the dresser?

18          MR. TASSEL:  No.  The larger gun, the Smith & Wesson

19  SV-40 is in the nightstand with the other female-related items.

20          THE COURT:  I see.

21          MR. TASSEL:  That's in the nightstand directly next to

22  the bed.  There's a hairbrush and some wipes, a red item.  The

23  smaller gun, the one that doesn't appear to have a magazine in

24  it, is the chrome -- it looks like a .25 caliber.  It's in the

25  bottom drawer of the larger nightstand that has the mirror and

1  the perfume and so forth on top of it.

2            THE COURT:  Okay, thank you.

3            MR. TASSEL:  The violence enhancement, so I don't

4  dispute that some very unsavory things were said in the

5  conversations concerning Solis and Rougeau.  I make two points:

6  The first one is, it's clear in the context of these

7  conversations that Mr. Tejeda has a number of bosses; and he

8  appears in the conversations that he's having with regard to

9  the loss of the 9 kilograms of fentanyl, he's very afraid of

10 the situation.  Now, whether or not he's being blustery or

11 honest in saying that he wants these horrible things to occur I

12 think invites some speculation, but there is some evidence that

13 suggests that it may be speculation.  The first one is, for the

14 reasons that I'm saying, this is his life, he's saying.  He's

15 desperate to make sure that he's not held accountable for the

16 loss of the overall organization's 9 kilograms of fentanyl.

17 It's a big seizure, there's no question about it, and it's

18 worth a lot of money that he's going to be held accountable

19 for, and that's why he makes the statement, his life.  He knows

20 in the context of those conversations that Rigo and German are

21 apparently, I respectfully suggest, higher up in the

22 organization, that he is responsible for getting the product

23 from them to Massachusetts for purposes of this discussion; and

24 if he loses it, he's responsible for it, either physically or

25 financially.  And so it would not be improbable for him to talk

1    tough, if you will, because if he acts like he's rolling over

2    to Rigo and German, it may get back to the bosses that the guy

3    that he invited into this scheme, Rougeau, Panther, ran off

4    with the drugs, and I think he's involved with it,

5    respectfully, to the bosses, because he's not acting like --

6    he's just rolling over and playing dead.  He's not talking

7    tough.  And when --

8              THE COURT:  I've lost you in the pronouns.  Who isn't?

9              MR. TASSEL:  I'm sorry.  Mr. Tejeda.  If it gets back

10   to the bosses that Mr. Tejeda had a guy who was transporting

11   the drugs and he ran off with them, if he doesn't talk tough,

12   it's going to get back that maybe he's complicit as well.  It's

13   certainly worth a lot of money.  He would have the mechanism,

14   if your Honor finds that he's Ricky, to distribute this.  He

15   could say, "Hey, the police seized it, and what are you going

16   to do?  It's a tough world out there."  But he has to take the

17   position to Rigo and German that he's talking tough.  But does

18   he do anything about it other than talk tough?  I suggest he

19   does not, and that's why I don't think it's proper to give him

20   the violence enhancement, because whether or not -- I don't

21   think there's any real credible evidence that he actually was

22   out beating the streets to try to find somebody to go to

23   Oklahoma to do these horrible things.  I think it's plausible

24   that he could just be saying, "Well, this guy can't go.  Pelong

25   (Phonetic) can't go.  I can't find anybody, so what are you

1    going to do?"  But it's then German and Rigo who step up, and

2    they, if you believe the interpretation of the --

3              THE COURT:  Didn't he direct the use of violence?

4              MR. TASSEL:  Well, that's the thing.  As I understand

5    the state of the evidence, he wasn't able to find anybody to

6    go, so he couldn't have directed anybody to go.  If any

7    violence was actually directed, it was done by German or Rigo,

8    who I think it was ultimately German --

9              THE COURT:  I thought it was his voice.

10              MR. TASSEL:  He's talking about it, but I'm suggesting

11    to you, your Honor, that he's just talking about it.

12              THE COURT:  Oh, you're saying it was empty?

13              MR. TASSEL:  It was -- I -- I --

14              THE COURT:  "Going along" is your thing.

15              MR. TASSEL:  And he's talking tough to make it seem

16    like he's not complicit in the loss of the drugs, because you

17    see how quick these people are to jump to conclusions:  Oh, it

18    can't be true because the police wouldn't just let somebody go.

19    The next thing you know, they're going to be thinking that he's

20    complicit in it if he's not talking tough.  And based on the

21    evidence, I don't think there's really anything that says that

22    he directed anybody.  He may have talked about it, he may have

23    engaged in this discussion who directed it, but as far as him

24    directing it and the end result of what it makes in the

25    Guideline range, I suggest it's not supported.

1          The other thing is that certainly in other cases I am

2     aware of, the threat of violence was never relayed to anybody

3     on the receiving end.

4          THE COURT:  I agree with that.  That said, the

5     alternative is "directed the use of violence."  A threat to use

6     I agree doesn't apply, but "directed the use of violence" is

7     one of the prongs under 2D1.1(b)(2).

8          MR. TASSEL:  Right, so it's a threat which is not

9     conveyed.  Actually direct or commit violence, so we know

10    that --

11         THE COURT:  Or directed the use of violence, told

12    someone to do it.

13         MR. TASSEL:  And that's the point --

14         THE COURT:  That's what you're saying, he's just

15    talking tough?

16         MR. TASSEL:  He's talking about it.  If anybody

17    actually directed to Person B to go to Oklahoma and do some of

18    these things, it was at the behest of German and not him.  It

19    may be because he couldn't find anybody to do it, or it may be

20    because he was talking tough and didn't mean for it to happen.

21         The last point on that is, there are some

22    conversations that are before the Court in which Mr. Tejeda,

23    he's acting like he wants to send somebody there to extricate

24    Solis, and whether that's just -- it looks like he gets angrier

25    or more focused on the violent end of it as the conversations

1   proceed, but his initial reaction is not to go there and harm

2   anybody.  His initial reaction is, send somebody there to

3   extricate them and kind of rescue them from the situation.  And

4   it's as the conversations progressed that this violent aspect

5   comes up, but again I reiterate:  If anybody was directed to do

6   anything violent, I don't think it was by Mr. Tejeda based on

7   the evidence that's before the Court.

8           THE COURT:  Thank you.

9           MR. TASSEL:  And, lastly, with respect to role in the

10  offense, certainly there are a number of people that were

11  involved in the money laundering aspect of the case, I can't

12  suggest otherwise, just on video.  That raises one other point

13  with respect to one of Mr. Kanwit's points, that this is a

14  career, sophisticated individual, and I take some pains to

15  argue that in the memorandum as well.  But he doesn't conduct

16  himself like somebody who's particularly savvy or career or in

17  this for the long haul.  He comes off as kind of a buffoon, if

18  you will, and I say that with all respect to him.  But the way

19  he conducts himself by having money, apparently at certain

20  instances drugs or certainly cut and packaging materials in his

21  own home where he puts his head every night, driving around

22  cars that are registered in his own name and that of

23  Ms. Carmenatty, to walk into a bank with a stack of $8,000

24  repeatedly and to put it on top of the counter with a video

25  camera in front of you doesn't bespeak of somebody who's a

sophisticated, wary drug trafficker or head of a serious DTO. And that was one of the things that drew my attention as the government was presenting its case to your Honor for sentencing, that their information was that this was a wary, surveillance-savvy individual who never conducted himself -- at least my client never conducted himself that way at any point during the investigation that I can see. He's living out in the open in a house that's full of contraband, full of money. He's inviting people into the house to collect the money. It's inconsistent with him being the person that it's suggested would be appropriate for a 30-year sentence.

But back to the role in the offense, when I look at the number of people who he is actually seen directing in any way, it doesn't add up to five. On the money side of it, yes, but all the information that seems to be before the Court is really that Ms. Carmenatty was running that side of the operation, if you will.

THE COURT: Well, but if he's Ricky, which you've now found he is, there are a number of other people involved, right? Rougeau, the Panther, Solis, Alicea, Bate, Carmenatty herself.

MR. TASSEL: Well, I look at -- some of these people appear to be --

THE COURT: I guess Torres.

MR. TASSEL: -- might be people who are responding to

him, but -- for example, there was some discussion in the
sentencing hearing, and your Honor pointed it out, that if he
goes to a store, and I think it was with respect to this issue
if he's buying drugs from somebody, if he just goes into a
store and he's conducting himself as a customer of this person
who is receiving the services or goods from that person, is he
part of this man's organization?  We know that it sounded like
he may have hired Rougeau on a prior occasion.  Maybe he's
credited.  Saul pops over if you -- from the testimony, they
get a call.  The police see him kind of arrive that day.  He's
never seen coming or going.  Mr. Alicea is not seen coming or
going at any point during the investigation.  When you really
add up the actual people who are seen regularly on the drug
side of the operation, Yoelly is driving around with him, he
apparently has talked to Rougeau on other occasions, but you
don't see four other people, five plus himself, coming and
going and dealing on the drug side of the operation.  And
that's why I suggest to you that with respect to the scope of
this thing, on the drug side of it, it may not warrant a
finding that there's five.  A supervisory over Yoelly
Carmenatty?  I couldn't say.  But he certainly, I think for
purposes of this discussion, he does appear to supervise
Rougeau, and he's going to be held responsible.

             THE COURT:  And Bate.

             MR. TASSEL:  Well, Bate, recall, according to the

evidence, comes from Mexico to pick up the money ostensibly for
the bosses, and so I think he's coming from above to take money
from the underling, and then therefore should not be credited
as being part of his --

THE COURT: Well, he'd be part of the conspiracy, but
you'd say he didn't supervise him is what your point is, I
guess.

MR. TASSEL: Yes.

THE COURT: All right, so before I get to you, did you
want to say something?

MR. KANWIT: Yes. I'll be very brief, your Honor.
First of all, again, he doesn't have to supervise or organize
all five people. He only has to supervise or organize at
least one.

THE COURT: He at least supervises Rougeau and --

MR. KANWIT: And as long as there are five
participants, including himself, he's there, and he admitted
that in his Rule 11. He admitted being part of a conspiracy
with five or more members.

Then on the violence, I don't know what to say.
Counsel simply has got a very, very different interpretation.

THE COURT: Read again what he says on the transcript.
He says, "Go take his head off" or something?

MR. KANWIT: He says, "We're going to grab that girl
and we are going to tear her fingernails out." And then for

Rougeau, he says -- for Solis Ricky says, "Anyway, let's grab
this girl, and once the black guy gets there, you can grab him.
Get four or five guys and put a gun to his head, tie him up and
make him talk.  Otherwise we'll chop his head off."

He was making call after call.  Special Agent Hamelin
said there was this frantic flurry of calls after the Oklahoma
bust.  He was trying to find anybody he could to go up there
and carry out these threats.  They tried to get Solis to stay
there, but at the outset it never was because they wanted to
extricate her.  It was because right from the start, they
thought this was a rip-off by Solis and Rougeau.  Rougeau had
already said he's in the wind.  He called and said, "I'm in a
sewage tunnel.  I lost one of my shoes.  I've run."  Solis was
the only one who was in the hotel room.  They talked to her
several times.  They wanted to make sure she stayed there so
they could get the truth of what happened.  And it was not just
tough talk.  He was hiring somebody.  That's why we did the
protective arrest of Lily Solis.

THE COURT:  All right, thank you.  Anything else?

MR. KANWIT:  On the guns, again, you know, it's not --
he doesn't have to have a mens rea.  We don't have to establish
that.  They just have to be available for use in the crime, and
two guns in --

THE COURT:  No.  He has to possess it.

MR. KANWIT:  He has to --

1    THE COURT:  That's the Guideline, you have to possess

2    it:  "If a dangerous weapon, including a firearm, was

3    possessed, increase by two levels."

4        MR. KANWIT:  Right, but there's not a specific

5    mens rea to that.  You know, the idea that this gun was --

6        THE COURT:  "Possessed" means the ability to exercise

7    dominion and control, so he had to have the ability to exercise

8    dominion and control.  And I guess the answer would be, there

9    are two guns in the bedroom he had access -- he likely knew

10   about them, and even if they were technically hers, the ability

11   to exercise dominion and control, so --

12       MR. KANWIT:  Right, and we would say they were not

13   hers.  The picture on her phone of her brother holding a gun

14   posed with cash, that was just sort of braggadocio.  It doesn't

15   mean it was his gun.

16       THE COURT:  Who knows?

17       MR. KANWIT:  They were there.

18       THE COURT:  All right, thank you.

19       Mr. Martinez-Tejeda, do you want to speak?

20       THE INTERPRETER:  The defendant has asked me to read

21   it out loud.  It's in Spanish.

22       THE COURT:  Okay.

23       THE INTERPRETER:  "Good morning, Honorable Judge.

24   First of all, with all due respect, I would like to ask

25   forgiveness for the faults I committed.  It was because of my

youth and ignorance.  To the government and the society of this

great nation, I, Jerri Martinez-Tejeda, accept my

responsibilities in this conspiracy of money laundering and for

entering illegally into the United States.

"At this time, this time has served me to reflect and

to learn and to see, and this is because of the necessity and

the difficulties that I have gone through and that my wife,

Yoelly, went through because she was pregnant and had to give

birth under these circumstances.  To my dear daughter Yoelly,

who today will be eleven months old, I ask for compassion so

that I can begin my life anew with my family in my country, the

Dominican Republic.  I am sincerely grateful for whatever you

might do for me and for my family.  Thank you for giving me

this opportunity to express myself, and God bless you."

THE COURT:  Thank you.  And who's back there?

MR. TASSEL:  You have Rafaela Cintron, Santa Villega

Ramirez, Nicori Martinez, Frank Porter, and Victor Ramirez.

THE COURT:  They're family members here to support

him?

MR. TASSEL:  And friends.

THE COURT:  And friends.  All right, thank you.

Anything else?

MR. KANWIT:  Not from the government, your Honor.

Thank you.

THE COURT:  All right, you may be seated.  Thank you.

So let me start off with the Sentencing Guidelines, as I must. I've been listening carefully, but I haven't heard any evidence, new evidence since the last time that we met; and, as you know, I asked the probation officer who is here to calculate an alternative Guideline range. I continue to find that the drug transaction at Paragraph 17 and the one at 46 were not proven by a preponderance.

I worry about the fact that so much money was being laundered, and I take the government's point that one could possibly reverse engineer that money. However, I'm not persuaded I have enough evidence to do that. And also there was a second drug conspiracy, a lot of money, I'm going to take that into account in other ways, but I am not at this point prepared to say by a preponderance of the evidence that it moves it up an offense level for the drugs. So I'm going to stick with the 25,570 kilograms as the operative amount proven by a preponderance of the evidence.

I do agree with the government that a gun was possessed. I think that there were two guns in that bedroom. While they may have technically been owned, at least one of them, by Yoelly -- they were in her drawer -- I do believe they were possessed within the meaning of the law. I find by a preponderance of the evidence he knew about them and had the ability to exercise possession and control over them.

I agree with the government that two levels should be

added for directing violence.  They have it on tape.  And I
don't think this was Mister Tough Guy just puffing.  I think
they were actually out to capture these two people and commit
violence on them to find out where the drugs were.

I do find that he was a -- I frequently find this.  It
sounds so simple, but it turns out to be very difficult, what
the role in the offense is.  I find there were five people
involved in the conspiracy involving both the drugs and the
money laundering and that he supervised at least one of them.
I always have a difficulty in who's a leader and who's a
manager, and that makes a difference under the Guidelines.
There is more than one times a reference to a Petrone and
certain other people that he's worried about, and so I am going
to give him the benefit of this doubt.  I find it hasn't been
proven by a preponderance that he was actually a leader.  I
think there was a Petrone in Mexico, or at least that's the way
the transcript seemed to read, but I do think he was a manager
or supervisor, and therefore I add three levels.

Now, actually the hardest issue came up at the tail
end of this, and I really have never hit this issue before on
the acceptance of responsibility.  When I reread the plea
colloquy, I thought there was full acceptance of
responsibility, and suddenly, at the tail end of the last
hearing, and particularly in the sentencing memo, I got worried
about that because of the denial of "I am Ricky."  I will take

1   Mr. Tassel's representation that that was his work rather than
2   suddenly backtracking on everything that was said in the plea
3   colloquy.  I'm not sure whether this is done as a variance or
4   whether this is done as a Guideline calculation, but I am
5   giving that extra point for acceptance of responsibility, and I
6   am going to take -- just given the fact everything was about
7   acceptance till we got to the point of the sentencing memo,
8   which was filed over the weekend, apparently without
9   coordination with the defendant, and so I am not going to take
10  away that one point because of it.  To the extent that the
11  defense counsel was objecting to the enhancements, he should.
12  The government was looking for life.  I can hardly say that
13  that is at least a life Guideline range.  I think that would
14  have been ineffective not to have challenged some of these
15  things, so I certainly don't think challenging the Guideline
16  enhancements, I think that would be an inappropriate basis to
17  withdraw the one point, or not file for the one point,
18  correctly stated.
19          I wasn't sure what to do with the -- like, does
20  actually denying something that you admitted all the way
21  through a plea colloquy and in failing to object to the PSR,
22  does that somehow get so extreme?  Maybe, but I don't think
23  that the defendant saw that memo, and I think that at the end
24  of the day, that was Mr. Tassel trying to be an attorney making
25  the more technical argument, the government hadn't proved it

up, without going back and reviewing that plea colloquy. I
mean, it just was a question I always ask, and I was sitting
there thinking to myself, "God, is this the one time I forgot
to ask?" But I didn't. I asked. So that just basically
cleared it up.

And so with that, I find that -- and I'm hoping I get
this right because it's a lot of math, but I think going back
to the -- I just wanted to make sure Jen was here on this
one -- it ends up at 40 and I, right?

MS. BROQUIST: That's correct.

THE COURT: So that's at 292 to 365, supervised
release range of three years, and a fine range, is it $25,000
to $2 million? Does that shift again?

MS. BROQUIST: That doesn't change. It says 38 or
above.

THE COURT: Well, okay. And it's a little higher here
because we're looking at the old book, right?

MS. BROQUIST: Yes, and you go back to the --

THE COURT: Yes, you do, and a $300 special
assessment.

Now, I don't find there's any basis for a departure,
so now I go to the variance issue, and I look at the nature and
circumstances of the crime under 3553(a). I agree with the
government that Mr. Martinez-Tejeda was a large drug
trafficker, big scale. I think it's sometimes hard in these

cases without a drug ledger or a cooperator.  If you don't have
that, you can't figure out exactly how much other than what
you've seized.  So I don't know how many of these many, as
Mr. Kanwit put it, dozens of drug deals that were discussed
actually went to fruition.  I can't tell that.  There was a lot
of money involved, over $632,000 in money laundering and
$511,000 in cash seized.  That's a lot of money under any
scale.  I have seen, unfortunately, drug conspiracies this big
in New England but not many.  Over 22 years, not many.  This is
among the largest I've seen.  And I think there were a lot of
people involved.  Ten push phones, that's some sense of it.
There are well more than five people involved if you count both
the money laundering and the drugs, well more.  And I think you
were a manager of that or an organizer in the sense that -- I'm
giving you the benefit of whether it's a three or a four, but
you were the top of the heap here in the Lawrence area, and I
do think they're very serious crimes.  And this did involve
guns, and it did involve violence, and it did involve a lot of
money.

Now, I look at the mitigating factors.  You are a
first-time offender.  I mean, I always take that seriously.
You don't qualify for the safety valve, but you were Criminal
History Category I, and at the end of this, I have to look at
what's sufficient but not greater than necessary.  I think
30 years would -- I think the Guidelines here, I don't see a

1  reason to go below them.  I think, if anything, the amounts of

2  money and drugs were just so huge.  I will go to the low end of

3  the Guideline range at 292, three years of supervised release.

4  He will be deported, right?

5       MR. KANWIT:  Yes, your Honor, but three years is still

6  mandatory.

7       THE COURT:  So three years.  As a condition of

8  supervised release, I don't think you'll stay here, but let me

9  just say, it's not just a condition of supervised release, it's

10  an immediate order that you shall not in any way try to

11  interfere with this investigation or in any way try to

12  intimidate or threaten or have anybody involved in your family

13  or friends intimidate or threaten anybody who's a witness in

14  this case or involved in this case in any way.  This is more

15  violent than many.  It involves Mexico and these cartels, which

16  I see reported on every day as to what they do to people.  I

17  don't know who it is you deal with.  I don't know who it is

18  that was involved as Petrone, but in no way should you -- and

19  one of the -- I want to make sure that this is true of your

20  friends and family members:  You can't in any way

21  participate -- this is a direct order -- in trying to threaten

22  or intimidate anybody involved in this investigation.

23       In terms of a fine, I guess is the one thing I have

24  left, I am going to impose a fine of $632,000, which is exactly

25  the amount that was found to have been laundered.  I believe

the forfeiture only covers the $500,000, is what Mr. Kanwit

just represented to me.  Is that correct?

MR. KANWIT:  I would actually need to check the

indictment, your Honor.

THE COURT:  Isn't now the time I have to do it?

MR. KANWIT:  We would ask for forfeiture as alleged in

the indictment, and I think the Court can enter an order like

that.

THE COURT:  Do you have it right there?  Do you have

it there?

MS. BROQUIST:  I do.  There's a money laundering

forfeiture allegation, your Honor, and it asks for a number of

things, a sum of money, the total amount traceable to the

offenses.  It asks for $4,000 in currency seized on June 4,

$511,270 in currency seized on July 12, and then there's

several vehicles that it asks.

THE COURT:  I see, so it's -- does it give a dollar

figure?

MS. BROQUIST:  Other than the seized amount, it does

not appear to.

THE COURT:  So the 500.  All right, so do you have an

objection to anything charged in the indictment, Mr. Tassel?

MR. TASSEL:  Not in the forfeiture, no.

THE COURT:  In the forfeiture, all right.  All right,

so I'll order what's charged in the indictment, but I'm going

1    to do a fine, which appears not to be included in the

2    indictment in the amount that was seized on the -- roughly the

3    amount seized in the money laundering.

4             MR. TASSEL:  I just want to make sure --

5             THE COURT:  I don't want to double dip is the thing.

6             MR. TASSEL:  No.  I want to make sure you remember one

7    thing, which was that in the first day of the sentencing

8    hearing, there was testimony that when the local officials

9    tried to seize the money from the bank accounts that were at

10   issue, my recollection is, they said it had already been seized

11   by a parallel investigation, I think that emanated from

12   New York, and that the bank accounts were already --

13            MR. KANWIT:  I'm sorry, your Honor, but that's just

14   one account, the Aquaponic account, so there was no money --

15            THE COURT:  I just don't remember.  Is that part of

16   the $632,000, the Aquaponic?

17            MR. KANWIT:  It is, but that's -- there's no money --

18            THE COURT:  How much was it?  Do you remember?

19            MR. KANWIT:  I'm sorry?

20            THE COURT:  Do you remember how much it was?

21            MR. KANWIT:  No, but there's no -- that amount -- the

22   Aquaponic was a funnel account.  There's no link of the amount

23   that was seized by the Southern District of New York to this

24   defendant, so the Court shouldn't take into --

25            THE COURT:  I don't want to double --

1    MR. KANWIT:  We're not double dipping, your Honor.

2    THE COURT:  We may be a little bit.  Let me just say,

3  is that Lori Moccaldi's testimony?

4    MR. KANWIT:  Yes.  And it was a tiny fraction of what

5  went through the Aquaponic account that was seized because

6  that's all that was left there.

7    THE COURT:  It looks like Exhibit No. 1 is $500,000

8  and -- was that -- actually, it's marked as Exhibit No. 1 I

9  have in the old listing.

10    MR. KANWIT:  You may be looking at Exhibit 70.  We

11  don't have an Exhibit 1 that's anything other than a photo.

12    THE COURT:  Well, then I wonder why I have -- I can't

13  answer that.  Well, let me -- I don't remember.  Do you know,

14  Mr. Tassel, how much was seized?

15    MR. TASSEL:  Well, I think the Exhibit No. 1

16  ultimately became No. 53.  It was the first exhibit taken, but

17  it was already bound as 53.  And the Aquaponic deposits total

18  $222,230 according to this, and there were miscellaneous

19  smaller accounts that added up to the rest of the money.  So if

20  the idea --

21    THE COURT:  The Aquaponic is the -- all right, so let

22  me just -- so you think it's a couple hundred thousand?

23    MR. TASSEL:  Well, it says $222,230 in Exhibit 53, so

24  by that, if that account was no longer accessible, was seized,

25  it would be inviting speculation to say --

1          THE COURT:  Well, this is only going to be rough

2     anyway.  This is about punishing for the rough amount of the

3     crime, so I'll say $400,000 in fine.  I'm not sure we'll ever

4     find it anyway, but --

5          MR. KANWIT:  And just note the government's objection

6     to that, your Honor.  Thank you.

7          THE COURT:  Why?  You've got to give me specifics.

8          MR. KANWIT:  Well, I'd be happy to.  There's no

9     relationship between the seizure of money by a different

10    district of that account and what this defendant did.  That

11    account funneled millions and millions of dollars.

12         THE COURT:  Sure, but so help me out here.  So the

13    $632,000 in the money laundering included the Aquaponic amount.

14    It did.  That part I have notes on.

15         MR. KANWIT:  Yes, but not the money -- the money that

16    was seized by the Southern District is not anything to do with

17    what this defendant deposited in Aquaponic.  Different DTOs

18    throughout the country were depositing into Aquaponic.

19         THE COURT:  So how much was seized of the $632,000 is

20    attributable to the Aquaponic?

21         MR. KANWIT:  Zero.

22         THE COURT:  I don't remember her testimony going that

23    way.

24         MR. KANWIT:  No.  What she said was, this defendant,

25    his organization deposited over $200,000 into the Aquaponic

1  account, but what you just asked me is, can we make an

2  adjustment based on a seizure from that account?

3         THE COURT:  But it's not a quid pro -- it doesn't need

4  to be exact because this isn't a forfeiture.  This is a fine.

5         MR. KANWIT:  They're two completely different things.

6  It's like giving this defendant credit for something that

7  happened in California.

8         THE COURT:  I was hinging it on amount, so maybe

9  that's the big mistake.  I'm not going to hinge it on any

10 amount, but I am going to do a fine.  So what is your argument

11 for a fine?

12        MR. KANWIT:  My argument for a fine is, we put into

13 evidence a transcript in which this defendant talked about

14 sitting on $1 million to $2 million and sending it over to his

15 aunt in the Dominican Republic.  That's why we asked for a

16 million dollars of a fine.  We think that's appropriate.  He

17 made a lot of money from this.  And if the Court wants to

18 appropriately punish the behavior, it should be more than a

19 slap on the wrist; it should be a significant amount.

20        THE COURT:  I hardly think in my life as a judge, it's

21 rare that I have imposed anything more than $20,000 or $30,000

22 for a fine, so hundreds of thousands is hardly a slap on the

23 wrist.

24        What is your recommendation, Mr. Tassel, as far as a

25 fine goes?  I mean, he's relying on the transcript.

1          MR. TASSEL:  As a practical matter, and I hate to at

2     this point, given the sentence that's already been imposed, be

3     too practical, but I would suggest the minimum fine, $25,000.

4          THE COURT:  Well, the issue is, he does send some

5     stuff over, he does talk about that, and there was a huge

6     amount laundered.

7          MR. TASSEL:  I'm just basing it on his ability to pay

8     at this point and where he's going to be spending --

9          THE COURT:  You know, I never got anything in the

10     presentence on assets, right?

11          MR. TASSEL:  There were no assets according to the

12     PSR.

13          MS. BROQUIST:  I don't think he reported any.

14          THE COURT:  Did he say he had none, or he refused to

15     discuss it?

16          MS. BROQUIST:  My recollection is that he reported

17     none, but let me just look.

18          MR. TASSEL:  He reported none at this point -- it's in

19     the PSR -- given his circumstances.

20          THE COURT:  I'm going to stick, I just think roughly

21     ball- --

22          MS. BROQUIST:  Paragraph 164, he denies having any

23     assets or liabilities.

24          THE COURT:  Or liabilities.  All right, the $400,000

25     is what I'm going to impose as the fine.

1        So let me just read the notice of appeal rights.  So

2  the only condition of supervised release other than the

3  standard ones and the financial ones is no contact with any

4  witnesses, anyone involved in the investigation, and no members

5  of the family or friends should do that as your agent.

6        MR. TASSEL:  I just -- I ought to be heard on that

7  point.

8        THE COURT:  Yes.

9        MR. TASSEL:  Because whether you recall it or not, he

10  speaks daily to Ms. Carmenatty, and they are still very much

11  involved in their relationship.

12        THE COURT:  I see.

13        MR. TASSEL:  And it was one of the things that he

14  wanted to talk about, and I kind of suggested otherwise, but,

15  frankly, they still talk in very loving terms to each other on

16  a daily basis, as I understand it.

17        THE COURT:  I see.

18        MR. TASSEL:  And they do have the child together.  I

19  think they're going to be in communication, respectfully.  I --

20        THE COURT:  Are they actually married?

21        MR. TASSEL:  They are not married to each other.

22        THE COURT:  But it's clear that he's the father of the

23  child?

24        MR. TASSEL:  He is, and --

25        THE COURT:  Well, everything that he says to her will

1    be tape-recorded anyway because it's out of a prison setting,

2    so what is -- they are married --

3         MR. KANWIT:  They are not married.

4         THE COURT:  De facto married, and they have a child

5    together.

6         MR. KANWIT:  I would want to be heard at sidebar about

7    that, your Honor.  Also, the other issue I wanted to raise is,

8    there's a 20-year statutory maximum on each of the counts, so a

9    292-month sentence --

10        THE COURT:  It would have to be consecutive on one of

11   them.

12        MR. KANWIT:  Yes, your Honor.

13        THE COURT:  On the money laundering, right.

14        MR. KANWIT:  Thank you.

15        THE COURT:  Did you want to see me at sidebar?

16        MR. KANWIT:  I do, your Honor.  Thank you.

17        THE COURT:  Read the appeal rights, yes.

18        THE CLERK:  Could you please stand.  The Court hereby

19   notifies you of your right to appeal this sentence.  If you

20   cannot afford the cost of an appeal, you may move to proceed in

21   forma pauperis.  Any appeal from this sentence must be filed

22   with fourteen days of entry of judgment on the docket.

23        Do you understand these rights?

24        THE DEFENDANT:  Yes.

25        THE COURT:  All right, I'll see you at sidebar.  Let

me just reserve till after sidebar what I do on the

Ms. Carmenatty issue.

SIDEBAR CONFERENCE:









THE COURT:  So I just spoke at sidebar with

Ms. Carmenatty's lawyer, and I asked him to find out from her.

I have no problems with him calling her, you calling her, if

1    she wants it, and I am going to ask her that question.  It's a

2    very, I understand, difficult situation because you're

3    codefendants in a conspiracy, but you're also the co-parents of

4    a child.  Yes?

5         MR. TASSEL:  If he has some question, I think he ought

6    to relay it to me, your Honor.

7         THE COURT:  Yes.

8         (Discussion between Mr. Tassel and the defendant.)

9         MR. TASSEL:  He wants to relay, your Honor, that he

10   speaks to her every day, and these calls are recorded; and if

11   there's anything untoward, he's confident that you would have

12   heard about it by now, but that's what he wants to relay.

13        THE COURT:  Right, but at some point, if she doesn't

14   want it, and maybe she's moving on with her life, I don't know,

15   but at least I'm not barring it right now.

16        MR. TASSEL:  Thank you.  And there are state remedies

17   if she wants to restrain him from calling her and --

18        THE COURT:  Well, no, that's my job too.  We don't

19   need to go into state court.  But right now I am not precluding

20   him from talking to her --

21        MR. TASSEL:  Thank you.

22        THE COURT:  -- about the child or something personal

23   or whatever, but not about this case.

24        THE DEFENDANT:  Well, I don't know what's going on

25   now.  I don't know if she's told her attorney that she doesn't

1　want to speak to me, I don't know.

2　　　　THE COURT:  I don't know either, and I will find out,

3　but at some point, right now I do not have a record for banning

4　you from talking to the mother of your child; but if I do, I

5　will amend the judgment -- or, actually, we can actually wait

6　because I think I'm sentencing her soon, so I might not even

7　issue the the judgment till then so I can ask.  Let me put it

8　this way:  I would only say "with her consent" is how it would

9　be worded.  All right, anything else?

10　　　　MS. BROQUIST:  We'd ask that if deported, he not

11　reenter.

12　　　　THE COURT:  Yes, that if deported, he not reenter.

13　And I also should add to that that you use your real name,

14　which is, as I understand it, Martinez-Tejeda, right?

15　　　　MR. TASSEL:  It is, to the best of my knowledge,

16　certainly.

17　　　　THE COURT:  Okay, you read the notice of appeal

18　rights?  You read it.  Good-bye.  Thank you.  I'll see you

19　tomorrow, is it?  Yes.

20　　　　And I should add one thing.  I did not see a basis for

21　sealing these.  If you want to look and see if there's

22　something particular, you can redact that something specific,

23　but in general sentencing memos are public documents.  So why

24　don't you look at it, and if you have any redactions, get it to

25　me by the end of the week, all right?  That's both sides here.

1          MR. KANWIT:  Yes, your Honor.

2          THE COURT:  Ninety-nine percent of this should be

3    public.

4          (Adjourned, 11:54 a.m.)

5                    C E R T I F I C A T E

6

7

8    UNITED STATES DISTRICT COURT )
     DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )

9

10

11          I, Lee A. Marzilli, Official Federal Court Reporter,

12   do hereby certify that the foregoing transcript, Pages 1

13   through 59 inclusive, was recorded by me stenographically at

14   the time and place aforesaid in Criminal No. 15-10224-PBS,

15   United States of America v. Jerri Martinez-Tejeda, and

16   thereafter by me reduced to typewriting and is a true and

17   accurate record of the proceedings.

18          Dated this 7th day of January, 2017.

19

20

21

22

23

24          /s/ Lee A. Marzilli
     _____
     LEE A. MARZILLI, CRR
25   OFFICIAL COURT REPORTER